My name is Reed Larson. I represent the plaintiff appellant Fred Mancini in this matter. This matter comes before the court on a grant of the defendant's motion for summary judgment. This case involves the Americans with Disabilities Act. Mr. Mancini is presently diagnosed and suffering from epilepsy as his condition. I don't know for convenience of the court whether you'd rather me go through a lengthy description of the facts or just respond to some of your questions first. I think the most important thing in this, in the summary judgment issue, is that there are disputed material issues of fact. One of the things that I don't believe was considered by the court below, which I think is one of the most important, is Mr. Baker. And that's found in excerpts of record. I think it's tab nine of the excerpts of record. And Mr. Baker, his testimony establishes a number of critical events for Mr. Mancini's claim. First, that in regard to Mr. Mancini's employment with the Union Pacific Railroad, he was doing his job in a satisfactory manner from July when he started in 1998 until he started having seizures in September of 1999. He continued to do his job satisfactorily from September of 99 until his February 2000 seizure. One of the things that is interesting in this aspect, though, is the way he was treated by the Union Pacific Railroad changed after his seizure of September of 1999. The evidence of that change occurred as a result of Mr. Mancini having a conversation with his supervisor, Al Farrell, which is documented by Mr. Mancini's affidavit, wherein Mr. Mancini was told by Mr. Farrell, he said, hi guys, what illnesses or diseases do you have today? And a direct indication that Mr. Farrell was now not happy with Mr. Mancini and not happy with his having this problem of epilepsy. Well, did he fail to disclose the possibility of seizures in connection with his initial hiring? Yes, he did. Well, couldn't an employer be concerned about that? You know, if they have somebody doing a job where a seizure would result in an accident or harm or death even to one or a thousand people, can't they expect to get an honest answer in the application process? Yes, they can. And if you look at the application, which I believe is part of the executive record, it's a post-offer of employment physical. And it's question number 28. And Mr. Mancini answered that question, do you have seizures, epilepsy, or fits? He answered it, no. And then at the bottom of that document, it says you're supposed to give your best efforts in answering this application. And what Mr. Mancini was dealing with at that time was he had had incidents of alcohol abuse and drug abuse, and he had seizures. And he was told as part of his treatment for those that he didn't have seizure disorder, that he was having reactions to his drug and alcohol abuse. He was saying when he filled out the form, he didn't know he had epilepsy. Correct. How did he know? I mean, does the record tell us whether he had ever been diagnosed and communicated to him that he had epilepsy before that? The record doesn't tell us that. It tells us that he had a confused diagnosis or confused treatment for that and received conflicting information. Now, that became a critical issue after his seizure February 20th. And my point in regard to Mr. Farrell, Mr. Farrell ends up being the decision maker throughout this. And his comment, while it could have a legitimate interest of an employer saying I've got an employee with seizures, if we look at the affidavit of Mike Baker, it can't be read that way. And specifically Mr. Baker's statement on his affidavit, paragraph 8, he says, in my opinion, since he has been shown to have a seizure disorder, Mr. Mancini has been unjustly harassed by UPRR and treated differently than similar employees that do not have a disability. He has been singled out for investigation. UPRR has harassed him since February of 2000 seizure. He has been disciplined for reporting of a late knee injury. And then he goes on to say, it's further my opinion that the treatment Mr. Mancini has received by the UPRR as a result of having been found to have a seizure disorder has been against their own policy. And finally, and I think this is important because this goes to the time after he was initially terminated and got his job back. We have a period of time in May of 2001 to October of 2001 where Mr. Farrell is indicating that he can't accommodate Mr. Mancini's restrictions. And Mr. Baker says essentially those restrictions were not essential functions of the job. Let's focus for a minute. In order to succeed in your ADA claim, you have to establish that there was, in fact, there was a disability. Correct. And as I understand the record, that Mr. Mancini was able to medically control the seizures. Is that correct? That he only had three seizures in ten years? He had a period of time from 94 until 99, actually I think it's 93 until 99 where he was seizure free. And then he had a breakthrough seizure in August of 99. He had seizures in September of 99. He had seizures in February of 2000. And then he's continued to have periods of time that are intermittent where he doesn't have seizures. And then he has breakthrough seizures after that. But it doesn't, the question is really whether he's substantially impaired in a major life activity. And if he can medically control his seizures to the extent that he only had three in ten years, how is he substantially impaired under the case law? Well, under the case law, you have to look at him individually. And you also have to look at whether or not the medication really masks the symptoms or whether, like the Sutton case. And the Sutton is a classic example where you can correct your vision with glasses. Now in Mr. Mancini's case, while he takes the medication, he doesn't eliminate his disease. All he does is mask or control, in some effect, the seizures. Every time he gets sick, and this has been one of the things he's dealt with, is if he and happens to throw up, he has seizures. And that's what happened in February 2000. If that was the correct legal analysis, then wouldn't every recovering alcoholic be disabled? No, because a recovering alcoholic presumes that you're still not drinking and you're not taking medication to not drink. You're treating or correcting the disease of alcoholism. Correct. You're not doing it by medication of which you could involuntarily, in Mr. Mancini's case, throw it up and then be right back into breakthrough seizures. And likewise, there's no guarantee that just simply by taking the medication, you're not going to have a seizure. He still has had seizures when he's been medicated. If you look at the affidavit of Dr. Girard... So you think the district court was wrong in finding that he wasn't disabled? Correct. We believe that first, epilepsy is one of those recognized categories of disability under the ADA and under the CFR when the ADA was enacted. And that the district court didn't look at Mr. Mancini individually. All he looked at is to say, well, he can take medication and the seizures can have control, therefore he's not a qualified individual. He didn't look closely enough at what was actually transpiring in Mr. Mancini's case, and that is the disease remained active and he continued to have problems. In fact, in tab 18, I believe, the affidavit of Dr. Girard, she says that her... Was that part of the record before the district court? Yes. I don't think it was. Exhibit 18, Dr. Girard's declaration? It was part of the record before the court below. It was? On summary judgment? On the motion, post-summary judgment motion. Right, but it wasn't before the court on the summary judgment motion. Correct. She had other... Submitted post... It was on a motion to reconsider. Motion to reconsider. Now, are you appealing from the motion to reconsider or the summary judgment itself? We consider the denial of summary judgment and the motion to reconsider to be essentially the same. They were both denied. Which is your notice of appeal? The notice of appeal is from the grant of summary judgment. You're appealing the summary judgment order? Correct. That's what we're reviewing. Correct. And that declaration wasn't in front of the court at that time? That's correct. Okay. Ms. Girard, or Dr. Girard, does state that Mr. Mancini has a complex partial seizure disorder with secondary generalization, well-controlled, but well-controlled is not completely controlled. And even if it's... I don't think we can consider that if it wasn't before the district court at the time it rendered the decision that we're reviewing. Well, even the affidavit of Dr. Girard where she says that it's well-controlled doesn't... Okay. Let's say we can't consider that. What is the other evidence on that point? That's where I was going back to the other affidavit of Dr. Girard, which... Was before the court? Was before the court. And I believe that's found at tab 6 of the Exhibits of Record where she was trying to describe his seizure disorder at that time. I don't really think it makes a difference under the case law we've cited to this court, under Rawlings and under Odding, that the fact that Mr. Mancini was taking medication, he was still having effects of seizures and he was still having interference with his daily activities, including his medical regimen, including his other issues and problems that he was trying to deal with in addressing his effects of the seizure disorder. I understand your argument. You're saying the medication helps him manage the symptoms of the disease, but it doesn't really eliminate the disease. But how does the epilepsy, given the medication for it, interfere with major life activities? Well, certainly when you have a seizure, it interferes with your ability to breathe, to walk, to talk, and engage in any voluntary actions because you're completely involuntary at the time of the seizure. And, I mean, that interfered with his ability to work in February of 2000, and that was the precipitating event that led to his dismissal. And then he does end up with some restrictions from May of 2001 until October of 2001 that interfere with his activities of work. Now, our contention is those restrictions were not essential functions of the job. And there's certainly a disputed fact issue on that when you read Mr. Baker's affidavit testimony and you compare that with his deposition testimony. You can't reconcile the two. They're in direct conflict with each other. We think that Mr. Mancini was a qualified individual with a disability because of his epilepsy. If you look at Tiffany Mancini's affidavit, she describes the types of things that her husband went through when he had seizures, and that includes involuntarily losing his bladder control, curling up in the fetal position, not having a recollection as to the events that occurred before or after the seizure. We think that shows that he has a serious problem when the seizures take place. And, once again, the medication doesn't cure the problem. And there's no guarantee that even on medication he's not going to continue to have problems. In fact, the record indicates that he has continued to have problems even after being on medication. But there are periods of time when, thank goodness, the medication works and he doesn't have seizures. But because he continues to have the threat of problems and because he continues to have problems, we believe he is a qualified individual with a disability. Was epilepsy per se a disability? You don't thereafter make the individualized determination? After Sutton, I don't think there is a per se disability. And I would agree with you that during a seizure, Mr. Mancini is definitely disabled at that point in time. The real question in this case is whether, when he's on the medication, are his major life activities affected or impaired during those periods of time. And we've cited, I've tried to cite the court to his affidavits, Mr. Mancini's affidavits, Dr. Beckstead's affidavit, Dr. Girard's affidavit, Tiffany Mancini's affidavit, and even the affidavit of Mike Hall, or excuse me, by Mike Baker, that deals with those things and shows that there is an effect on his major life activities, including the activities of work, including the activities of walking, including the activities of recollection. All of those things are affected. I had the impression that if he was on medication, as prescribed, that he was free from seizures. Am I wrong? He went through periods of time where he was free from seizures. And you're not wrong, it's just you need to ask the next question. And the next question is, under what circumstances does he not have seizures? And the answer is, every time he has a viral illness where he loses medication, he is at further risk for seizures, which happened in June of 2001. I mean, I trust that once he gets over the viral infection or whatever else and can tolerate the medicine, he's okay again, right? I have to clarify this, because at the time of the record, as it exists before the court on this case, the answer to that is yes. And as it exists on the cases that the court can take judicial notice of that are just starting up through the system, the answer is no. Okay, he was reinstated to work with the two conditions. Is that correct? At the state of this record, he was reinstated. At the state of this record, in October of 2001, he was reinstated, yes. So I take it you're suggesting that his condition may have worsened and he's not working right now, is that correct? His condition has continued to go down, and he has been terminated two more times. They terminated him, and then they reinstated him again? And terminated him again. What are they doing for these other periods of time? Those are the cases that are coming up. Oh, okay. So this case takes us to November. When was this case filed? October of 2001, right? I have to look, Your Honor. That's okay. That's okay. I think it's September 10th of 2001 is when this case was filed. So there are separate lawsuits covering later periods of time with the same parties? Yes. Why is that procedurally? Why did it occur that there are separate suits rather than a supplemental complaint or, you know, an amended complaint? Well, because each time we go through a violation, we have to go through the EEOC, we have to go through the Idaho Human Rights Commission, and we have to go through those processes to get the right to sue before the court has jurisdiction so we can proceed. And I'll admit it's cumbersome, and I certainly wouldn't like to be here on all those, but that's where we sit. Are the other cases pending in our court now? They're pending in the federal district court in the state of Idaho. So in those cases, like I said, that's why it's difficult to answer your question, Your Honor, and to be fair on the record is one thing, but to be fair in truth and reality is another. Let the other cases play out, wherever they go or whatever the evidence is. That's how I view it, and I think that's the appropriate way, but I think I had to disclose to you what the truth was and where we really sit. Well, let me just ask you something about the disease of epilepsy. It may not be in the record in this regard if it's not appropriate, but you're saying his condition worsened. Is it worsened while he's taking medication so that the medication ultimately wasn't able to control it? Is that like on a regular basis? And the answer to that is yes. His condition worsens, and then the effects worsen. Stress increases a person's ability to have the epilepsy be controlled. Lack of sleep affects the ability of a person with epilepsy to have control, and it makes it more likely that you're going to have a breakthrough seizure, even while you're medicated. As you get older, if you have that seizure disorder, does it worsen necessarily with age? I hope not, and I'm speaking from personal experience. I was diagnosed with epilepsy in 1977, and I've been seizure-free and medication-free since 1985. You're certainly not impaired. Well, I mean, there are courts that probably would disagree with you on that, but, you know, I don't know of that, that it increases with your age. It is a very individual thing. People respond differently to medication, and people respond differently to environmental stimulus, and that's an unfortunate situation for Mr. Mancini. I see my time is up. I appreciate your attention. Thank you very much. Please, the Court. Jeff DeVagere, appearing on behalf of Union Pacific Railroad. I have to confirm something that's very important with regard to this appeal. Originally, this lawsuit involved two different periods of time in which Mr. Mancini was off of work, and he was suing for those two periods. But he is not appealing the first period of time that he was off of work. He's only appealing that second brief four-month period from June 1st of 2001 to October 1st of 2001. That's what's being appealed, and that's the subject which is before this Court at this time. A four-month period in which he was off of work. These other issues that Mr. Larson was talking about, I haven't even seen the lawsuits yet. I do know that he was terminated again because he came to work without taking his medication and was sick. He violated the restrictions that he had, which could have obviously led to something a lot worse than we even want to think about. In any event, the absolutely undisputed evidence in this case that's before this Court is that Mr. Mancini's epilepsy or seizure disorder, and even the risk of seizures, is completely eliminated when he's on his medication. End of story. And there's no evidence of the contrary. And that's evidence from his own treating physicians, and that's also evidence from Mr. Mancini himself that his medication controls his seizure. It just doesn't even mitigate it. It completely controls it. Now... But, see, he can lose control at any moment, right? If he were to get sick. It doesn't even have to be a viral disease. I mean, what if he ate something that didn't agree with him? No. The only evidence is that when he has a viral, it's kind of a two-pronged thing. When he has a viral illness and when he's unable to keep his medication down, he can still be sick. As long as he's – when he can't keep his medication down is when he's at risk of having a seizure. There is no evidence, Your Honor, in the record whatsoever that Mr. Mancini has ever had a breakthrough seizure when he's on, and they call it a breakthrough seizure, when he's on his medication. He's only at risk when he can't keep his medication down, which is infrequent. But we can infer from the record we have that if he were to get sick at lunchtime or something, or something he ate, not a viral illness, and he couldn't keep the medicine down, and he happened to be at work, and how would he know that he couldn't even keep it down if it was something that suddenly came upon him? Then he would have that seizure, and he wouldn't be able to be performing that job. He might have the seizure, but the evidence in the record, Your Honor, is that, again, to call your attention to that four-month period of time, he did not have a seizure when he was on medication. There's no evidence to the contrary. There's no evidence that he's ever had a seizure when he hasn't been on his medication. I guess theoretically you're right, Your Honor, he could, but the record is replete. It's not – the seizures are infrequent. Mr. Mancini does not deny that he can function normally when he's on his medication. There's no evidence in the record whatsoever that he was limited, let alone substantially limited, in things like – and I'll refer to the Mikas brief that I've read – reproduction, caring for himself, breathing, socially interacting with people. That's not in evidence. As long as he's having a seizure, he can't walk or talk. Well, when he's having a seizure, exactly, Your Honor, that's true. His life activities are limited during a seizure. They are. Oh, absolutely. He can't – It seems like it's whether, in light of the way he can manage the disease, are his major life activities substantially limited. And there's no evidence to suggest that he can't. He lives a normal life when he's on his medication, and those seizures occur infrequently. And that's particularly true for that brief four-month period of time. How is this medicine administered? I take it that he takes a pill periodically. I suppose. I don't know. Do you know? I don't know for sure how he takes it. I think it's orally, though. And do we know how frequently? I think it's daily. I think he has to take it daily. I would almost defer to Mr. Larson. I don't know for sure, Your Honor. Would he ever tell us? I'm not sure. I don't think so. If he went to work and got an upset stomach and, let's say, threw up, would that mean that he would be without medicine, or is he taking medicine on a schedule that wouldn't be affected by an anticipated upset stomach at the lunch hour or something like that? I think – no, I think what – I think we have – You don't know, right? I don't know. I think what we have to presume is if he's not sick – even if he's sick, he can still work. It's when he starts to throw up. Then we've got to be careful. And that just doesn't happen very often. During this four-month period, he was not at work. No, he was not at work. No. And it was – he wasn't at work because his physician and others had decided that he had to have certain restrictions on him. Right. And with those restrictions, his employer, through the supervisor, said that he couldn't be accommodated, right? Right. Now, that is an issue, is it not, as to whether or not he could have been accommodated? Yeah, it is, Your Honor, and let me – here's how I want to go with that. All right. The courts have held that the determination of whether a particular task is an essential job function is determined by the employer, and that's undisputed, okay? Mr. Mancini was an assistant signalman. The essential functions of his job included operating power hand tools and climbing poles and ladders. That's what he does, an assistant signalman for Union Pacific Railroad. Now, those restrictions of – he was issued restrictions by his own treating physician that he couldn't operate power hand tools. We get those restrictions and we say there's no way we can reasonably accommodate that. If we tried to, it would be an undue hardship because that's what these guys do. No employer is obligated to eliminate an essential job function in order to accommodate an employee. They are not obligated under the law to do that. And that was an essential job function of Mr. Mancini, to operate power hand tools and to climb poles and ladders. That's in the record through Mr. Farrow and Mr. Baker. And so they get these restrictions and say, you know, we can't accommodate this, but you know what we're going to do? We're going to work with you. We're going to – temporary. Temporary brief, four-month period. This is not permit restrictions. These are just temporary. And we're going to monitor your medical progress. We're going to see how you're doing. We're going to work with you. And they did. And they said, you know what, we'll reevaluate you in September of 2001. That's what they did. And guess what? He was okay. He came back to work October 1st without restriction. I take it that none of his work activities require him to be around rolling stock or anything like that. He's out there when there's not necessarily any traffic around. It's similar to repairing facilities or maintaining facilities, wires and poles and one thing or another. Am I right? I think so, Your Honor. There's a danger, a health and safety risk for himself and the people he works with, generally speaking. Yes. Falling off the ladder. Yeah, yeah. Or getting tangled up in a power tool. That's right, Your Honor. I will tell you, I mean, if the railroad had not done what it did in giving those temporary brief restrictions for that brief period of time and they said, you know what, I don't care. If you've been restricted from power handles, who's still going to have you come out? Let's say they did all that. And let's say, what's the alternative here? It's hurting himself and it's hurting somebody else or maybe killing somebody else. And instead of me standing here defending an ADA lawsuit, I'm defending a personal injury or wrongful death lawsuit. There's nothing that was imprudent for the railroad that did what it did. How is the dispute presented over whether or not the activities were essential to the job? There is a dispute about that. There's no dispute that the operation of power hand tools is an essential job function of an assistance signalman. There's no dispute about that? No dispute. Mr. Manson, he doesn't dispute that. In fact, he admits it. He admitted it in his deposition. Now, his contention is, I take it, that he could be accommodated by eliminating that from his job for a time. Right. We couldn't accommodate that because it would create an undue hardship. The employees he was working with would have to work longer and harder to cover for that, for Mr. Mancini in that instance. His restrictions also included not climbing poles and ladders, Your Honor, and that's also an essential job function of an assistance signalman. They just couldn't accommodate that. It was unreasonable to be able to do so. Well, these people work in crews of a number, I presume, work in a crew, some up the pole, some not. Well, no. What happened here was, let's assume Mr. Mancini was to return to work on June 1st of 2001, the first day of that brief four-month period. At that time, the gang he would have joined, and this is in the record through an affidavit, only had four people. And ultimately, that crew diminished to two people by the time Mr. Mancini joined it only four months later on October 1st. The work that they did was climbing poles and ladders and operating power hand tools. Yes, somebody else had to cover for him, and the evidence is also undisputed that, even through Mr. Farrow and through Mr. Baker, that that would be hard for them. It would be very difficult to be able to work under that kind of scenario. Again, it's only a four-month period of time that's at issue with this appeal, right? And those restrictions he had were temporary. They were reevaluated, and he was clear to come back to work without restriction after he had shown that he was okay, that the medicine was working. Were all those restrictions conferred in by his own physician? Yes. It was not added by him? No. They were all his treating physician's restrictions. The railroad just adopted them. They said, you know what? That's reasonable. We're going to follow those restrictions. And I should say that Union Pacific Railroad employs people with seizures. They have specific guidelines for return to work or fitness for duty in determinations in individuals with seizures. They follow those guidelines. And the guidelines say it's highly preferable if an employee goes seizure-free for three months. And the Union Pacific followed those guidelines. And, in fact, the Union Pacific sought and obtained the guidance of the Epilepsy Foundation of America when they promulgated those guidelines. I mean, they were trying to do the right thing here. And I think, well, I know in this instance they did. We've kind of got into the regarded the district court held specifically that Mr. Mancini didn't have an impairment that substantially limited a major life activity because of medication-controlled seizures. That's just undisputed. The Union Pacific also didn't regard him as having such a limitation for the reasons I've talked about, and that is the Union Pacific had no misperceptions regarding Mr. Mancini's limitations because those limitations were set out by his own treating physician. And Mr. Mancini has never shown any evidence that he disagreed with his treating physician's recommendations or restrictions. And so that's pretty clear. And just another point, even if Mr. Mancini could show that he was disabled within the meaning, well, that he had an impairment that substantially limited a major life activity, he still has to meet the other prongs for a prima facie case of discrimination. We kind of talked a little bit about the accommodation part that Your Honor brought up. He also has to show that he suffered an adverse action due to discrimination. And I briefed that. That is before you. But, you know, the railroad adopted reasonable recommendations, restrictions, that his own treating physician recommended. I mean, it was just that simple. And they waited to see how he was going to do after that brief period of time. There's also a defense, and I would refer the Court to the Chevron v. Echezable case within the ADA, which says if a company can have a qualification standard if there's a, I want to say the right thing, poses a threat, a direct threat of a health or safety risk to a person or to people that that person works with. And that's a real recent case. I don't know what off the top of my head, but in any event, that's a defense to an ADA claim. And in this instance, Mr. Mancini has admitted if he had a seizure on the job, he's going to hurt somebody. And he's going to maybe hurt himself. So the railroad can do that. Any employer can do that. They can assess the safety risk to the employee and the employee's colleagues, even if that person has a disability. Are the Epilepsy Foundation guidelines part of this record? I'm sorry? Are the Epilepsy Foundation guidelines part of this record? Yes, they are. They're attached to an affidavit in the record of Dr. John Kuhnlein, who was the railroad's fitness for duty medical director at the time this all occurred. And then, and so the railroad's position is, you know what, even if he's disabled within the mean of the ADA, which we completely deny, he still can't show, he can't show a deprime bifida case, and the railroad can easily show legitimate nondiscriminatory reason for its actions. The railroad has every right to be concerned about Mr. Mancini and his employees and to adopt reasonable restrictions, which are only temporary, to see how he was doing, to make sure he was okay before letting him come back to work. That's a legitimate nondiscriminatory reason for what it did. And then finally, Mr. Mancini still has to show pretext for discrimination. In other words, that the railroad's reason was false and that the true reason was to discriminate. And he, again, can't do that either for the reasons that are in my briefing that I've discussed before you today. I don't think I have anything else, unless you have any questions. Thank you. Appreciate it. Thank you. Do you have one minute? Briefly. Very, very brief. In regard to the accommodation issue, I want to direct your attention to Mike Baker's affidavit, which is tab 9 of the excerpt of record, paragraph 10. Mancini was recently reinstated, and I was told by my supervisors at UPRR that obtaining a CDL and operating rail saws were no longer an essential part of the job of signalman. Therefore, these skills must not have ever been an essential part of Mancini's position as an assistant signalman prior to his 1999 discovery of seizure disorder. Therefore, there was no reason during that four-month period for him to be held out of service for the pretextual reasons that were given. Thank you. All right. Thank you, counsel. Mancini v. Union Pacific Railroad Company will be submitted, and the court will adjourn for this session. All right. The court for this session stands adjourned. Thank you. You're welcome. Are you going to try to make it? You betcha. Okay. I'm a gambler. I'm going to get to it. Thanks. He's here. Oh, yeah.
judges: Leavy, Wardlaw, Gould